UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
SAMUEL GREGORY,

                            Plaintiff,

      v.                                                     **DECISION & ORDER**
                                                              22-CV-2267 (WFK) (VMS)
BOSTON SCIENTIFIC CORPORATION,

                            Defendant.
-------------------------------------------------------------------X

**WILLIAM F. KUNTZ, II, United States District Judge:**
Samuel Gregory ("Plaintiff") brings this action against Boston Scientific Corporation ("Defendant"), alleging violations of various state tort laws and the New York Deceptive Trade Practices Act, N.Y. Gen. Bus. L. §§ 349, *et seq.*, in connection with the manufacturing and marketing of the AMS 800 Urinary Control System. Before the Court are Plaintiff's motion for partial summary judgment and Defendant's motion for summary judgment. ECF Nos. 38, 41. For the reasons stated below, Plaintiff's motion is **DENIED**, and Defendant's motion is **GRANTED**.

## I.    BACKGROUND

The following facts, drawn from the parties' Local Rule 56.1 Statements, declarations, deposition testimony, and other evidence submitted in support of the motions, are undisputed or described in the light most favorable to the non-moving party. Fed. R. Civ. P. 56(c); *Capobianco v. City of New York*, 422 F.3d 47, 50 n.1 (2d Cir. 2005).

### A.  FACTS

In 2008, Samuel Gregory ("Plaintiff") underwent a proctectomy to treat his prostate cancer. Pl.'s R. 56.1 Statement ¶ 1 ("Pl.'s R. 56.1"), ECF No. 38-2. Following the surgery, Plaintiff began suffering from urinary incontinence. *Id.* ¶ 2. Plaintiff tried several treatments unsuccessfully before consulting with Dr. Christopher Kelly about other ways to manage his incontinence. *Id.* ¶¶ 4–5. Dr. Kelly advised Plaintiff he could implant Plaintiff with a urethral sling or artificial urinary sphincter. Def.'s R. 56.1 Statement ("Def.'s R. 56.1") at 5 ¶¶ 24–25, ECF No. 41-3. One such device is the AMS Sphincter 800 Urinary Control System ("AMS

1

800"), a Class III medical device used to treat urinary incontinence by simulating normal sphincter function. *Id.* at 1–2 ¶ 1, 4–5. Defendant Boston Scientific manufactures, designs, and sells the AMS 800. Compl. ¶ 10, 120, ECF No. 1-1. The AMS 800 received Pre-Market Approval ("PMA") from the Food and Drug Administration ("FDA") in 2001. Def.'s R. 56.1 at 2 ¶ 5. The AMS 800's original PMA and subsequent 124 supplemental PMAs remain in effect as of the instant lawsuit. *Id.* ¶ 6.

Plaintiff spoke with Dr. Kelly about the AMS 800—including the device's benefits and risks—prior to implantation. *See, e.g.*, Pl.'s R. 56.1 ¶¶ 8–9. Dr. Kelly advised Plaintiff the AMS 800 has no guaranteed life span but said "[t]en years was a fair estimate of how long it would last." Gregory Dep. at 33, ECF No. 41-10; Pl.'s R. 56. 1 ¶¶ 8–9; Def.'s R. 56.1 at 5 ¶ 26. Dr. Kelly informed Plaintiff of potential complications associated with the AMS 800, including "malfunction of the device" and "persistent incontinence." Def.'s R. 56.1 at 6 ¶ 27. Plaintiff himself did not review any warranty information, marketing materials, instructions, or warnings before implantation. Gregory Dep., at 36–37, 44–45, 49–50, 61, 83.[1]

On August 25, 2017, Dr. Kelly implanted Plaintiff with the AMS 800. Def.'s R. 56.1 at 6 ¶ 33. In April 2019, approximately twenty (20) months after Dr. Kelly implanted Plaintiff with the device, Plaintiff began experiencing leakage. Def.'s R. 56.1 at 7 ¶ 2. Approximately six

---

[1] Plaintiff states Dr. Kelly may have read the device's "Instructions for Use" ("IFU") aloud to him. Gregory Dep. at 37:5–24. The IFU state "it is not possible to predict exactly how long an implanted prosthesis will function." Ex. D, Def.'s Mot. for Summ. J. ("IFU") at 7, ECF No. 41-8. The IFU disclose possible complications associated with the device: "[t]rauma or injury to the pelvic, perineal or abdominal areas, such as impact injuries associated with sports, can result in damage to the implanted device and or surrounding tissues," which "may result in the malfunction of the device." IFU at 3. The IFU note unsuccessful outcomes can occur from, among other reasons, improper cuff sizing, balloon selection, surgical technique, or sterile technique. *Id.*

months after that, Plaintiff received an ultrasound, which revealed a leak in the cuff of the device. *Id.* ¶ 7. Although Dr. Kelly stated he could not opine on the cause of the leak, he posited Plaintiff's vigorous lifestyle, which included stationary biking, could have been a possible cause. *Id.* at 8 ¶ 11.[2]

On November 7, 2019, Plaintiff had the first device removed, and Dr. Kelly implanted a new AMS 800 device. *Id.* at 8 ¶ 1. Plaintiff contends the second AMS 800 device failed within thirteen (13) days of its activation on December 12, 2019. Pl.'s R. 56.1 ¶¶ 17–18. An ultrasound taken on October 12, 2021, revealed a leak in this device as well. Def.'s R. 56.1 at 9 ¶ 6. Plaintiff contends he did not engage in any stationary biking between the second device's implantation and its failure. Gregory Decl., ECF No. 38-12. Plaintiff claims the failure of both AMS devices caused him "emotional distress so severe that it could be reasonably expected to adversely affect mental health." Compl. ¶ 106.

## B. PROCEDURAL HISTORY

Plaintiff commenced this action on February 21, 2022, against Boston Scientific Corp. and American Medical Systems, LLC (collectively, "Defendants") in the Supreme Court of the State of New York, Kings County. *See generally* Compl. Plaintiff brought claims for: (1) strict products liability and negligence (First and Fourth Causes of Action); (2) breach of express warranty (Second Cause of Action); (3) breach of implied warranty of merchantability (Third Cause of Action); (4) negligent or intentional infliction of emotional distress (Fifth Cause of Action); and (5) violations of the New York General Business Law §§ 349, 350 (Sixth and

---

[2] Plaintiff states Dr. Kelly assured him the exercise bike "wouldn't be the cause of the leak" and "it was an aberration that it would leak in such a short period of time." Gregory Dep. at 55:14–56:5.

3

Seventh Causes of Action).[3] *See generally* Compl. On April 21, 2022, Defendants removed this action to federal court on the basis of diversity jurisdiction. Notice of Removal, ECF No. 1.

On August 1, 2022, Defendant Boston Scientific Corp. filed a motion to dismiss, arguing Plaintiff's claims are preempted by federal law. Def.'s Mot. to Dismiss, ECF No. 14. On July 12, 2023, the parties filed a stipulation of dismissal as to Defendant American Medical Systems, LLC. Stipulation of Dismissal, ECF No. 24.

On April 8, 2024, the parties completed briefing on (1) Plaintiff's motion for partial summary judgment as to his manufacturing defect and implied warranty of merchantability claims; and (2) Defendant's motion for summary judgment. ECF Nos. 38–43. On July 14, 2025, the Court held oral argument on these motions, after which the parties submitted supplemental briefing. ECF Nos. 47–48. The Court now considers the parties' respective motions for summary judgment.

## II. LEGAL STANDARD

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). "An issue of fact is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008)

---

[3] At oral argument and in supplemental briefing, Plaintiff withdrew his claim for false advertising under NYGBL § 350. Pl.'s Suppl. Mem. at 4, ECF No. 47.

4

(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.*

When evaluating motions for summary judgment, courts must review whether the record could "lead a rational trier of fact to find for the non-moving party." *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 212 (2d Cir. 2001) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In doing so, courts must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal citation omitted). "[T]he court is not to make credibility determinations or weigh the evidence. 'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" *Rupp v. Buffalo*, 91 F.4th 623, 634 (2d Cir. 2024) (quoting *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000)).

"The same standard of review applies when the Court is faced with cross-motions for summary judgment." *Ethelberth v. Choice Sec. Co.*, 91 F. Supp. 3d 339, 349 (E.D.N.Y. 2015) (Chen, J.). "When evaluating cross-motions for summary judgment, the Court reviews each party's motion on its own merits, and draws all reasonable inferences against the party whose motion is under consideration." *Id.* (citing *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001)).

### III. DISCUSSION

#### A. Federal Preemption of State Law Claims under the MDA

In 1976, Congress enacted the Medical Device Amendments ("MDA"), 21 U.S.C. §§ 360c *et seq.*, to the Federal Food, Drug, and Cosmetics Act ("FDCA"), 21 U.S.C. §§ 301 *et seq.* The

5

MDA authorized the Food and Drug Administration ("FDA") to oversee the development of medical devices and established a framework for regulating such devices. *See generally* 21 U.S.C. §§ 360c *et seq.* Under this framework, medical devices are designated Class I, II, or III—based on their potential risk, usefulness, and related factors—and subject to oversight requirements associated with their class. *See* 21 U.S.C. § 360c(a). Class I medical devices receive the least amount of regulatory scrutiny, while Class III medical devices receive the most. *Id.*

Class III medical devices are "purported or represented to be for a use in supporting or sustaining human life or for a use which is of substantial importance in preventing impairment of human health [or] presents a potential unreasonable risk of illness or injury." 21 U.S.C. § 360c(a)(1)(C)(ii). Such devices, like pacemakers or the AMS 800 itself, present the greatest potential benefit and risk to patients.[4] To ensure device safety, the MDA "established a rigorous regime of premarket approval for new Class III devices." *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 317 (2008).

"Premarket approval is a rigorous process." *Id.* (internal citation and quotation marks omitted). The manufacturer "must submit what is typically a multivolume application." *Id.* The FDA "spends an average of 1,200 hours reviewing each application" and only grants premarket approval "if it finds there is a 'reasonable assurance' of the device's 'safety and effectiveness.'" *Id.* at 318 (quoting 21 U.S.C. § 360e(d)). In making this determination, the FDA "weigh[s] any probable benefit to health from the use of the device against any probable risk of injury or illness from such use." 21 U.S.C. § 360c(a)(2)(C).

---

[4] *See, e.g., Classify Your Medical Device*, FDA (last visited July 22, 2025), https://www.fda.gov/medical-devices/overview-device-regulation/classify-your-medical-device; *Learn if a Medical Device Has Been Cleared by FDA for Marketing*, FDA (last visited July 22, 2025), https://www.fda.gov/medical-devices/consumers-medical-devices/learn-if-medical-device-has-been-cleared-fda-marketing.

The MDA contains an express preemption provision. The preemption provision prevents any state from establishing or continuing in effect any requirement, with respect to a device intended for human use, that "(1) is different from, or in addition to, any requirement applicable under this chapter to the device, and (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter." 21 U.S.C. § 360k.[5] The MDA therefore preempts state law claims relating to the safety and effectiveness of Class III medical devices with premarket approval if such laws impose standards "different from, or in addition to" federal requirements. 21 U.S.C. § 360k(a); *Riegel*, 552 U.S. at 321–25; *Babayev v. Medtronic, Inc.*, 228 F. Supp. 3d 192, 215 (E.D.N.Y. 2017) (Townes, J.).

"On the other hand, if a cause of action under state common law only provides a damages remedy for claims premised on a violation of FDA regulations, then the state duties 'parallel', rather than add to, federal requirements, and the cause of action is not preempted under § 360k." *Bertini v. Smith & Nephew, Inc.*, 8 F. Supp. 3d 246, 252 (E.D.N.Y. 2014) (Cogan, J.) (quoting *Riegel*, 552 U.S. at 330) (internal quotation marks omitted). To bring such "parallel" claims, plaintiffs must "show specific violations of federal law, and then link those violations to his [or her] own injuries." *Bertini*, 8 F. Supp. 3d at 252. "[T]o survive MDA preemption, a plaintiff cannot simply demonstrate a defect or a malfunction and rely 'on *res ipsa loquitor* to suggest only . . . that the thing speaks for itself.'" *Weber v. Allergan, Inc.*, 940 F.3d 1106, 1112 (9th Cir. 2019) (quoting *Funk v. Stryker Corp.*, 631 F.3d 777, 782 (5th Cir. 2011)).

---

[5] The preemption provision also applies to political subdivisions of a state. *Id.*

7

### B. Plaintiff's Claims Fail Under Preemption Principles and Summary Judgment Standards.

#### i. *Strict Products Liability and Negligence (First and Fourth Causes of Action)*

Federal law preempts Plaintiff's claims for strict products liability and negligence. "To prevail on a manufacturing defect claim under theories of strict liability [or] negligence . . . a plaintiff must allege that the specific product that caused the plaintiff's injury was not manufactured as designed or was not built to specifications." *Gallego v. Tandem Diabetes Care, Inc.*, 776 F. Supp. 3d 119, 134 (E.D.N.Y. 2025) (Brodie, J.) (citing *Tears v. Boston Sci. Corp.*, 344 F. Supp. 3d 500, 510–11 (S.D.N.Y. 2018) (Nathan, J.)).[6]

Plaintiff's strict products liability and negligence claims are not "parallel claims" exempted from the MDA's preemption provision. Plaintiff does assert, albeit in conclusory fashion, that Defendant's manufacturing process violated federal requirements. Pl.'s Mem. in Opp'n to Def.'s Mot. to Dismiss at 6, ECF No. 16 (stating "the two AMS 800 devices implanted within [Plaintiff] did not adhere to the PMA issued by the FDA"). But Plaintiff does not explain *how* Defendant's manufacturing process violated federal law.[7] *See, e.g., id.* at 10 (claiming "monetary damages because the two AMS 800 devices implanted in [Plaintiff] failed to adhere to the PMA"). Because Plaintiff does not articulate how Defendant failed to adhere to the PMA or otherwise violated

---

[6] With respect to Plaintiff's strict liability claim, it is unclear whether Plaintiff alleges a manufacturing defect, design defect, failure to warn, or all of the above. Compl. ¶ 27 (referring to the device's "malfunctions and design defects"), ¶ 89 (alleging the AMS 800 "failed to perform in accordance with its intended purpose" because of its "defective condition"). But this lack of clarity is immaterial, as all such claims are preempted by the MDA.

[7] Initially, Plaintiff implies Defendant must affirmatively explain how its manufacturing process and device design comply with the PMA, arguing "Defendant does not even lay out what the PMA states they must do to be in compliance." Pl.'s Mem. in Opp'n to Def.'s Mot. to Dismiss at 4. But Plaintiff's argument is misguided. Defendant has shown, and Plaintiff does not dispute, the AMS 800 received pre-market approval. Plaintiff, not Defendant, must now present a viable argument regarding Defendant's alleged failure to comply with the PMA.

8

federal requirements, his claims for strict products liability and negligence are preempted by the MDA. *See Bertini*, 8 F. Supp. 3d at 253–60 (finding the plaintiff's design defect, manufacturing defect, failure to warn, and negligence claims were preempted by the MDA because the plaintiff failed to identify any FDA regulations the defendant allegedly violated); *Babayev*, 228 F. Supp. 3d at 215–16, 221–222 (dismissing strict products liability and negligence claims where plaintiff "failed to introduce any evidence to establish any defect or adulteration" or to "establish[] that Defendant violated a [particular FDA] requirement"); *Cordova v. Smith & Nephew, Inc.*, 14-CV-351, 2014 WL 3749421, at *6 (E.D.N.Y. July 30, 2014) (Bianco, J.) (dismissing the plaintiff's design defect claim where plaintiff "does not claim that the design of the [device] deviated in any way from the design approved by the FDA"); *Webb v. Mentor Worldwide LLC*, 453 F. Supp. 3d 550, 559–60 (N.D.N.Y. 2020) (D'Agostino, J.) ("Without specific allegations explaining how Defendants' manufacturing process was in violation of federal requirements so that the [devices] were defective, Plaintiff's claims fall directly within the MDA's preemption provision.").

Because the MDA clearly preempts Plaintiff's strict products liability and negligence claims, the Court dismisses them and declines to evaluate their merits.

### *ii.   Implied Warranty (Third Cause of Action)*

Plaintiff's claim for breach of implied warranty is also preempted by the MDA. Plaintiffs alleging breach of implied warranty of merchantability must show the device was not "reasonably fit for the ordinary purpose for which it was intended." *Horowitz v. Stryker Corp.*, 613 F. Supp. 2d 271, 284 (E.D.N.Y. 2009) (Trager, J.) (quoting *Denny v. Ford Motor Co.*, 87 N.Y.2d 248, 253 (N.Y. 1995)). "Such a claim falls squarely within the MDA's preemption provision." *Id.*

The FDA approved the AMS 800, by issuing an initial PMA and over 100 supplemental PMAs, for the purpose of resolving urinary incontinence. *See* Def.'s R. 56.1 at 2 ¶ 6. Plaintiff

9

cannot now "demand that [D]efendant design the [device] in a safer manner." *Bertini*, 8 F. Supp. 3d at 260. To do so would impose different and additional requirements to federal law. And again, Plaintiff's allegations in support of this claim are scant. Plaintiff has not identified a particular defect in the device or a particular FDA requirement Defendant allegedly violated. *See Babayev*, 228 F. Supp. 3d 192 at 216 (dismissing implied warranty of merchantability claims where "the pleading does not allege plausible facts that even suggest the nature of the defect or adulteration"). Accordingly, Plaintiff's claim for breach of implied warranty is dismissed as preempted by the MDA.

### iii. *Express Warranty (Second Cause of Action)*

Plaintiff's claim for breach of express warranty must also be dismissed as preempted by the MDA and otherwise lacking sufficient evidentiary support. Plaintiff contends Defendant breached its express warranty "that consumers could safely use the AMS 800 and related products." Compl. ¶ 63. Specifically, Plaintiff claims "the AMS 800 was, among other things, [falsely] warranted to last at least 5 years." Pl.'s Mem. in Opp'n to Def.'s Mot. to Dismiss at 10. "Under New York law, an action for breach of express warranty requires both the existence of an express promise or representation and reliance on that promise or representation." *Horowitz*, 613 F. Supp. 2d at 286. As a threshold matter, "Plaintiff's breach of express warranty claim is preempted to the extent that it is premised on FDA approved representations made by the manufacturer." *Webb*, 453 F. Supp. 3d at 560 (citing *Horowitz*, 613 F. Supp. 2d at 285).

And besides being preempted, Plaintiff's express warranty claim clearly fails on the merits. Plaintiff attempts to hold Defendant liable for statements made by Dr. Kelly on the grounds that Dr. Kelly "was an agent acting as an informed intermediary on behalf of Defendant.'" Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 14. Principals—here, Defendant—"can be held vicariously liable for

10

the acts of another under a theory of actual or apparent authority." *Fadlevich v. JD 34th Street Realty LLC*, 775 F. Supp. 3d 668, 693 (E.D.N.Y. 2025) (Morrison, J.) (internal citation and quotation marks omitted). Actual authority exists "when the agent receives explicit permission from the principal to act on its behalf." *United States v. Gatto*, 986 F.3d 104, 127 (2d Cir. 2021) (internal citation and quotation marks omitted). Apparent authority exists "when an agent has the ability to bind the principal to transactions with third parties because representations that the principal made to the third party make it reasonable for the third party to believe the agent has such an ability." *Id.*

It is undisputed that Dr. Kelly lacked actual authority to act on Defendant's behalf. Instead, Plaintiff contends Dr. Kelly had apparent authority to do so. *See* Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 13–14. "It is the law in this circuit . . . that customarily only the representation *of the principal to the third party* can create apparent authority, not the representation of the agent alone." *Gatto*, 986 F.3d at 127 (emphasis in original) (internal citation and quotation marks omitted); *see also Northwell Health, Inc. v. Premera Blue Cross*, 23-CV-389, 2025 WL 959651, at *16 (E.D.N.Y. Mar. 15, 2025) (Tiscione, Mag.) ("To adequately plead the existence of apparent authority, a plaintiff must allege words or conduct of the principal, communicated to a third party, that give rise to the appearance and belief that the agent possesses authority to enter into a transaction on behalf of the principal.") (alteration omitted) (quoting *Precedo Cap. Grp., Inc. v. Twitter, Inc.*, 33 F. Supp. 3d 245, 254 (S.D.N.Y. 2014) (Scheindlin, J.)).

Plaintiff does not allege Defendant made representations to him suggesting that Dr. Kelly had authority to act on Defendant's behalf. Plaintiff's sole allegation is that Defendant "published literature . . . [saying] prospective patients, such as Plaintiff, should speak to their doctor for information regarding the product." Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 14. Drawing all

11

reasonable inferences in Plaintiff's favor, the advice to consult one's doctor cannot be interpreted as vesting Dr. Kelly with apparent authority: it never even mentions Dr. Kelly. It is too big of a leap to read Defendant's broad reference to all prospective patients' unnamed personal doctors as creating a principal-agent relationship between Defendant and each of those doctors.

Accordingly, because Dr. Kelly is not an agent of Defendant, and because Plaintiff's breach of express warranty claim rests entirely on Dr. Kelly's alleged statements, Plaintiff's claim must also be dismissed for lack of evidence to survive summary judgment.

### iv.   *Negligent or Intentional Infliction of Emotional Distress (Fifth Cause of Action)*

Plaintiff's claim for either negligent infliction of emotional distress ("NIED") or intentional infliction of emotional distress ("IIED") is preempted because Plaintiff fails to allege a violation of parallel federal requirements. Under New York law, NIED and IIED share three elements: "(1) extreme and outrageous conduct, (2) a causal connection between the conduct and the injury, and (3) severe emotional distress." *Simpson ex rel. Simpson v. Uniondale Union Free Sch. Dist.*, 702 F. Supp. 2d 122, 134 (E.D.N.Y. 2010) (Seybert, J.). IIED claims feature the additional element of "intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress." *Lebowitz v. N.Y.C. Dep't of Educ.*, 407 F. Supp. 3d 158, 179 (E.D.N.Y. 2017) (DeArcy Hall, J.).

To avoid preemption, parallel claims must "show *specific* violations of federal law" and link those violations to Plaintiff's injuries. *Bertini*, 8 F. Supp. 3d at 252 (emphasis added). Plaintiff fails to make the requisite showing: he does not specify *any* federal law supposedly violated by Defendant, claiming only that Defendant failed to abide by the PMA. Indeed, Plaintiff's NIED and IIED claims are merely variations of his legally insufficient products liability claims. Because Plaintiff's NIED and IIED claims are not premised on a violation of FDA regulations, they are not cognizable parallel claims. *Accord Day v. Howmedica Osteonics Corp.*,

12

15-CV-85, 2015 WL 13469348, at *10 (D. Colo. Dec. 24, 2015) (holding IIED claim was preempted because it was "distinct from and broader than any federal requirements under the MDA"). Accordingly, Plaintiff's claims are preempted by the MDA.

### v. *Deceptive Business Practices (Sixth Cause of Action)*

Finally, Plaintiff's claim alleging deceptive business practices in violation of New York General Business Law ("NYGBL") § 349 is preempted by the MDA and otherwise lacks sufficient evidentiary support. To state a claim under NYGBL § 349, "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015) (quoting *Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940, 944 (N.Y. 2012)).

To the extent that Plaintiff challenges Defendant's FDA-approved promotional material, Plaintiff's claim is preempted by the MDA. The MDA proscribes claims "assert[ing] that the FDA-approved promotional materials should have been 'different.'" *See, e.g., Tillet v. CooperSurgical, Inc.*, 23-CV-6031, 2023 WL 4704091, at *6 (W.D.N.Y. July 24, 2023) (Geraci, J.). Such claims "go to the heart of express preemption." *Id.*

Even assuming, *arguendo*, that Plaintiff brings a valid parallel claim, which he does not, Plaintiff's claim still fails on summary judgment. Plaintiff contends Defendant marketed and sold the AMS 800 using false health claims. Compl. ¶¶ 120, 122. Specifically, Plaintiff argues Defendant falsely claimed the device would last at least five years. Pl.'s Mem. in Opp'n to Def.'s Mot. to Dismiss at 7. Plaintiff marshals, as evidence of the false marketing, the PMA approval letter, which states: "Expiration dating for this device has been established and approved at 5 years." Ex. A, Def.'s Mem. in Supp. of Mot. for Summ. J. at 2, ECF No. 41-5. But this statement

is attributable to the FDA, not Defendant. Plaintiff does not identify any statements made by *Defendant* guaranteeing the AMS 800 would last five years.[8] In addition, the cited statement does not relate, as Plaintiff suggests, to how long the device will function; the statement pertains to the device's shelf life. Because Plaintiff does not provide any evidence Defendant falsely marketed the AMS 800 in contravention of federal requirements, his deceptive business practices claim fails independent of its being preempted.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiff's motion for partial summary judgment is **DENIED** and Defendant's motion for summary judgment is **GRANTED**. The Clerk of Court is respectfully directed to close the case.

SO ORDERED

s/WFK

HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: August 25, 2025
        Brooklyn, New York

---

[8] Plaintiff points to Defendant's marketing materials, which cite statistics about the device's expected lifespan. *See* Ex. E, Def.'s Mot. for Summ. J. ("AMS 800 Physician Brochure") at 2, ECF No. 41-9 (stating "[o]verall device survival was 72% at 5 years, 56% at 10 years, 41% at 15 years at 33% at 20 years"). Crucially, none of these statements state the device will last five years.